The third case on the docket is 2-17-0740. Kevin Randolph from Packer Engineering, Inc. I remember on behalf of Kevin Randolph and his team, we are here to present the case of Kevin Randolph v. Morris. Mr. Borshaw. Good morning. May it please the Court. My name is Tim Borshaw. I represent the appellant in this case. Mark Langill is representative of Dr. Packer, the State, Packer Engineering, and the Packer Group. There are a number of errors made below that we'll get to, but I want to start with the issue of whether there should have been a trial in this case in the first place. It's our position that the case should have been granted a summary judgment based upon the final judgment entered in the Cook County case. Race judicata applies here. And so far as two of the elements of race judicata, there's no dispute between the parties. There's no dispute there was a final judgment entered in the Cook County case, and there's no dispute that there was identity of the parties. The issue the parties contest in the trial court found in plaintiff's favor is with the identity of cause of action elements. Long ago, the Supreme Court has adopted the transactional test, which basically says it's not the cause of action that are important, it is the facts that arise from those transactions, the operative facts that give rise to those claims. In this case, the operative facts in the Cook County case and the DuPage County case were virtually identical. In fact, they're basically carbon copies of each other. The fact that plaintiff alleged different claims in Cook County than the plaintiff alleged in DuPage County is not test, and in essence, irrelevant. Here, the cause of action arises from the same operative facts, and therefore, there is an identity cause of action on the transactional test, and therefore, race judicata applies. One of the issues that the trial court, after raising that issue and denying that issue, is the trial court found in dicta there was also acquiescence. We don't believe there's acquiescence here. Why not? Because there is the parties, in essence, did not prosecute this DuPage County case because of the Cook County case. If you look at what happened, they were filed on the same day, but in essence, what happened is, and you look at all the status hearings we submitted in the record, is the parties decided the Cook County case would be tried. This case, the DuPage County case, was secondary. And in fact, whether it was secondary or not, you didn't raise the issue in a motion to dismiss. That's true. And the case law seemed to suggest, and not just suggest, but require that the issue be raised. Well, we couldn't have raised race judicata then because there's no final judgment. Well, you could have raised issue preclusion or claim preclusion. We could not have because there was no final judgment in the Cook County case. Well, but you, Mr. Gorsuch, you filed an answer to both complaints, correct? That's right. And you filed a counterclaim. And in that counterclaim, I think you specifically indicated that venue was proper. Did you not? Yeah. We didn't challenge. Well, we initially challenged venue on arbitration clause. And you're correct on that. Right. But you asked for arbitration clause, but then you never filed a demand for arbitration, correct? But claim preclusion could not have been raised either. There was no final judgment. In fact, both parties here told the trial court the Cook County case is proceeding. When that case ends, we're going to argue claim preclusion or race judicata based upon the Cook County case. That's what happened here. The Cook County case ended. There was a final judgment. Within 30 days or so of that final judgment, we filed a motion for summary judgment. What's lost in all this is why did the plaintiff decide to split his claims? There's no basis for that, no explanation for it. In fact, the plaintiff alleged in the DuPage County case that he had to file shareholder oppression claims in DuPage County despite the fact under the Corporation Act he filed in Cook County under the same statute. And so the issue here is the plaintiff is the one who decided to split. We didn't decide to do this. We didn't want to have separate actions. The plaintiff decided to do that. And the plaintiff, by doing that, took on the risk that if there was a final judgment entered in one of the cases, there was going to be preclusion in the other case. In fact, the plaintiff himself argued that. The plaintiff himself argued based upon the Cook County decision, there should be claim preclusion. How can he now say now race judicata shouldn't apply because why not? It should apply. How many years have you folks been pre-trying this case? So the case was filed in 2011. The case went on for years. And what happened was the plaintiff decided to prosecute the Cook County case. We had discovery in that case. We had depositions. We had cases. And the case went to trial in that case in September of 14. All along, this case was put on the background. We told the court the Cook County case is proceeding. The Cook County case is going to trial. There was no case management. There were no orders of discovery cut off. There was no trial date being set. Because even if we told the court, it wasn't a surprise, we told the court, there is a Cook County case that's going to be decided. We're going to decide some of the issues in this case. That's what happened. That's why there's a gap in almost three years before this case goes to trial. Because this case wasn't being prosecuted by the plaintiff. The plaintiff decided to prosecute the Cook County case. The plaintiff decided to put that case to a judgment. And when you do that, you can't then say, after that, well, now I want more relief in a separate action. They're the ones who caused this entire splitting of the claims in the first place. We didn't. So we don't believe there's any back of the essence. But besides, it's moot. The trial court found that there was no identity of cause of action. There was no identity of cause of action. On all of the claims? Yes. So she found a way to kind of divide. She don't get that yet. Didn't she? It wasn't so much that she found that there was no identity. She was really having, she was struggling with what, how could she put these square pegs in round holes. And so if she erred, it was in kind of a, okay, I can't figure it out. I don't know that it is. I don't know that it isn't. So we're going to go to trial. Well, I think that some of that's correct. But really what she found is there's different causes of action. Correct. That's not the test. So if we had raised, on the first day, if we had said claims splitting, that motion would have been denied. Because they would have said different causes of action. So whatever would have been done, that wouldn't have mattered. Because she felt there were different causes of action. Well, we're not talking about what would have happened in the trial court, but to preserve the issue. I understand. I mean, that's a difference. Whether or not you're going to win or lose, you still have to preserve the issue. I understand that. I understand that. But we believe it's preserved. And we believe we did raise the issue. And we told the judge we're both going to argue. What page of the record is that? I have it in our brief. I don't have it up front, but I do have it in there. Where we, as a statute, we're both sides said to the judge, we're going to raise preclusion once the Cook County case ends. And, actually, the plaintiff's counsel is the one who said it. We agreed that's what was going to happen. And that's what we never thought this case was going to go anywhere, because once Cook County ended, we thought the case was going to be over. Also, now we get to more causes of action and more claims, which were already, in essence, the facts of which were litigated in Cook County. That's in your brief? Yes. But you had some – there were some different claims. There were some claims that – I mean, I'll give you – it looks like – hold on a second. There was an interference claim in DuPage County, tortious interference. Correct. There was a – well, the oppression. There was a wage and – wage payments. Wage act and a whistleblower. In DuPage. Correct. But did she not remedy that by the way she gave damages? She didn't overlap any of the damages, did she? Oh, no. We believe she did. Because I – for example, tortious interference, she awarded copyright damages that were awarded in Cook County. Yeah, but she – But that weren't paid at that point in time, is that right? Right. That weren't paid. Correct. That weren't paid. Right. Right. But we'll get to damages later. But, I mean, the damages are a different issue. But the bottom line is – Well, you say to get there later. You better get there because – Okay. Okay. Okay. Okay. So we believe – I understand. So the oppression claim is – we don't believe has been met because they're really all employment claims. There's no shareholder rights issues. They're all employment claims that they filed. Wasn't he a shareholder? He was. But he's not alleging any shareholder violations. Not alleging he wasn't allowed to vote in shareholder meetings. Wasn't even there. Well, he wasn't. He wasn't there at a certain meeting. He and Kohler weren't invited to a meeting. Well, Kohler wasn't even – According to the facts. That's not true. Kohler wasn't even – in terms of the issue of rebellion, well, Kohler wasn't even there when that happened. But Kohler was not on the board. And there were no shareholder meetings during this time period. But he's not claiming he was not paid dividends. He's not claiming he was not invited to shareholder meetings. He's all alleging his – my contract was violated at my employment. That's not an oppression claim. That's not a shareholder oppression claim. The wage act we talked about, the issue of – they haven't proven, they have no evidence, that Dr. Packer, who wasn't the CFO of the company, somehow didn't or intentionally violated the wage act. The assignment for the benefit of creditors is a legal procedure that the company went through that protects people like Pawfield, his creditor. He never objected to that when it happened. The assignee took over the Packer's – Did he know about it? Sure he knew about it. This is one of the issues. Sure he knew about it. By that time, he wasn't allowed in the building, was he? No, he was allowed in the building. He says he was allowed back in the building. That was a very – a short period of time. But when the company closed at the end of 11, early 12, after that, the assignment was made in May. Every creditor and employee was given notice of the assignment. He could have objected to it. He didn't. The assignee then decides what assets get paid. That's what an assignee does, not Dr. Packer. And if he didn't get paid, it wasn't on Dr. Packer. It was whatever – because the company was insolvent. The company had a huge amount of secured debt. And the assignee decided who – and they sold all the assets. And the assignee would decide who got paid, not Dr. Packer. And the assignment was legal. The damages issue – I get to the whistleblower issue. It's not a whistleblower claim. This is an intercompany financial dispute. This is not a whistleblower claim. It doesn't involve the health, safety, or welfare of Illinois citizens. Dr. Packer can't be liable individually under that statute because they said before he's not acting in the scope of his employment. Now they're saying he is in the scope of his employment. You can't argue it both ways. You had argued in your brief something to the effect of he could not have been the whistleblower because he was not first to discover the wrongdoing as required by the Whistleblower Act. What case do you have to support that proposition? I don't have any case on that, Judge Ironwood. But I think a whistleblower is somebody who alerts it and blows the whistle. In this case, even he says he didn't blow the whistle. Kohler came to him and said, here's an issue in the federal statute. It wasn't Caulfield who somehow blew the whistle. It was Kohler. So he can't be a whistleblower if he didn't blow the whistle. The fact that he tagged along with Kohler in the derivative case doesn't make him a whistleblower. And, in fact, in that case, the appellate court for a district found he violated a conflict of interest. And he was dismissed from that case. And now he wants to benefit from that case even though he was dismissed from the conflict of interest. That's not appropriate. The damage is in this case. I'm not sure where they come from. The oppression damages, they're supposed to be in front of it, but then they claim it for the briefs as they're basically to punish. There's no punitive damages either pled or allowed by the Illinois Corporation Act for oppression. Whistleblower act. You've got to say this is for a penal cost. Where are these numbers coming from? I mean, they're out of left field. They're round numbers that have no bearing in the evidence. You can't get punitive damages unless that's denied them. Tortious interference with contract is somewhat related to the issue of what is contractual. As Your Honor said earlier, he was not paid contractually. But the issue here is, in terms of what the derivative case is, is that is a separate case. The tortious interference with contract is a separate case. But he should not benefit from filing that lawsuit, because he was found by the court to have violated competent interest. I want to get to quickly the counterclaims that were dismissed. Those were dismissed on 615 grounds and 619 grounds. The breach of producer duty, we talked about that. He had a producer duty, Dr. Packer. As an officer of the company and a shareholder of Pulsey Health Corporation, he alleged numerous facets of how he violated those duties. And the trial court said, you didn't tweet enough facts. There's no positive action here, Your Honor. Conspiracy. Civil conspiracy. Civil conspiracy. We allege he conspired. Basically, this was a failed coup attempt that he had with Kohler and his attorney to try to oust Dr. Packer. These were a million issues that occurred years before this. He never raised any objection to it. He knew about it. He never raised any objection to it. And all of a sudden, when the sexual harassment allegation against him arose, all of a sudden, he hires my client's former counsel, and they start raising these financial issues that he knew about years earlier. And that's the basis to try to oust Dr. Packer from a company he founded 50 years ago. And we said, that's really what you're trying here. You're trying to coup here. You're trying to oust him and conspiring with other people to oust him from the company, including their former counsel. That was enough to allege a conspiracy. The law court says 6.5, you're out. Yeah, but, I mean, in when he was trying to oust him, the third element says, in furtherance of which one of the conspirators committed an overt, tortuous, or unlawful act. Wasn't all of the things that he was alleging, didn't they all turn out to be true and not frivolous? No, not true at all. In fact, the merits of those claims are in the derivative case. The merits of those claims have not been litigated. That case is compendium. The fact is, this Vermillion issue has not been found to be true or not true. That's part of that case. The Kohler case was separate involving his contract. The Cook-Heine case was his contract. This is allegations of financial punishment, which is a separate derivative case, which has not been adjudicated. In fact, in that case, Caulfield's attempt to oust Dr. Packer on injunctive grounds was denied. So that has not been litigated. And we tried to litigate it in this case, but we couldn't get past the 6.5 motion, which should have been allowed. Well, you have to specifically set out extreme and outrageous conduct. What extreme and outrageous conduct? It's not just following the case, but also telling the employees that Dr. Packer was a crook. Telling the employees that he committed financial requirements. Telling the company's clients, Dr. Packer's clients, that he was a crook. Harmed his reputation. Caused emotional distress. More than enough to satisfy a 6.15 motion. We didn't get past 6.15 in this case in that issue. So we believe we satisfied, and the trial court should have denied the motion. Thank you.  You'll have time for rebuttal. Thank you. Thank you. Mr. Morris. Go ahead again. Good morning. May it please the Court. My name is Hal Morris. I'm here with Michael Jacobson. We represent the appellee in the plaintiff in this case, Dr. Edward Huffman. This is a case where res judicata is absolutely inapplicable. The defendants acquiesced in the proceedings in the DuPage County action in front of Judge Reed. Probably the most telling aspect is found in the plaintiff's brief. When we look at the appendix to that brief, the clerk has prepared, obviously, the record or the contents of the record on appeal. There are five pages, single spaced, of activities that occurred within the DuPage County action from the time that the defendant answered until it then claimed it moved for summary judgment on the question of res judicata. The timeline is important here. This case in DuPage County was filed on April 1st, as was the case in the Cook County circuit court. That case proceeded. The defendants answered on June 7th. The Cook County case did not go to judgment for three more years, which was in February of 2014. The Cook County case was not affirmed by the first district for another year in March of 2015. It was not until May 4th of 2015 when the defendant filed a motion for summary judgment claiming res judicata. It was the first time there was a pleading within the case in DuPage suggesting anything like claims footing. What about the comments that counsel referred to that are in the brief where both parties said, or at least represented to the court, that either or both parties may argue a claim for preclusion once the Cook County case is tried? Is that as accurate as it is? It's not totally accurate, no. What is accurate is the Cook County case may have, for certain purposes, been effective for collateral estoppel on certain issues, but not on claim preclusion. And that especially is because, number one, the manner by which the DuPage County suit proceeded. And number two, as the Court has pointed out, what the Court in DuPage was asked to decide was very different factual determinations and based on different facts than the Cook County action. How was the tortious interference not related to the breach of contract? It's related only to the extent that there was a breach that was found in Cook County of an employment contract, but the Cook County Court did not consider any of the elements of torts, any of the facts related to torts, because that's irrelevant in a contract case. Further, the DuPage County Court had to decide questions of shareholder status and shareholder oppression. That was not in a breach of contract case in Cook County. It had to decide questions with regard to whether Dr. Packer, who was not even a defendant in the Cook County action, acted as a statutory employer to be responsible under the Wage Payment Act. It also had to decide under the whistleblower, which are different facts again, and that relates to the shareholder action that was filed, whether that was sufficient. Those are all things that were not decided factually or legally in the context of the Cook County action. Well, did you agree or did previous counsel or whoever preceded you, if anyone, did you agree to wait on the DuPage County case until the Cook County case was over? Only for certain purposes, and the reason I say it that way is when we look at the record in this case, there's no waiting. There's four pages of actions. There's motions to compel. There's motions for protective order. There's discovery motions. There's attempts to plead counterclaims by the defendant that happened three different times in this case. So, no, the DuPage County case was not waiting. It was proceeding, and it was proceeding with actually a lot of activity before Judge Wheaton in the DuPage County case. Did you ever get to the pretrial, I don't know the number, the 218 or whatever that number is, where you said, okay, these are the issues we're going to try? We didn't really do it that way, no. But what was also not missing was there was no 2619A3 motion ever brought by the plaintiff. That motion would have identified, irrespective of whether there was a final judgment in another action, i.e. in Cook County, that there was at least a prior pending action that the defendant believed should act to preclude the DuPage County action. That's conspicuously missing from this record, and that's an unexplained question. If they really intended the defendants to say, Cook County will be dispositive because it's already pending there, why wasn't that action filed? It was not filed. Similarly, there's nothing in this record, nor in the Cook County record, to suggest that an action or motion such as that was filed in Cook County. This is a case where the plaintiff filed in the two specific forms, as we did, with different facts that are operative in one, which is a very narrow employment contract case, and two in DuPage, which included statutory and tort claims, and they were different. They proceeded. But the shareholder suppression case, you indicated that it could only be filed in DuPage County. Based on Belle Toyota, it could have been filed in Cook, couldn't it? It may have been able to be filed in Cook, but by a strict reading, we felt it was better to file in DuPage so there would be no question in terms because that was the location of the company. What didn't happen again, there was never a motion to dismiss that. The only venue motion that was filed, which maybe could have gone to that issue, was on the question of arbitration, and that didn't go anywhere, as the Court has already indicated. So there was never in this record, in this case that proceeded for four years before it went to trial in DuPage, anything by the defendants to suggest, much less by a motion to preserve, the question that it shouldn't go forward and Cook County should go forward. And as I said, the mirror image is also true. There's nothing in the Cook County actions saying that case shouldn't go forward, DuPage should go forward. They proceeded in both. Wouldn't it have been, I mean, as Mr. Gorsuch points out, was it more of an agreement between the parties, hey, we're going to handle things this way, and perhaps that's why these 2619 and motions dismissed for venue, et cetera, et cetera, weren't filed? I don't think there was an agreement. I think what there was was a fundamental misunderstanding by the defendant, that if they wanted to have one proceed over the other, they could have filed it. And what the plaintiff did is we did believe, and we moved for partial summary judgment, not on res judicata before Judge Wheaton, but only on the issue of collateral estoppel, that there were certain issues, but not claims, and those would not cover everything. Judge Wheaton, when she heard those cross motions, one motion for collateral estoppel, one for res judicata, concluded, I can't make that decision, and I submit maybe the Court was actually correct in its observation, because I can't fit all of the facts from one case into another, which is, I think, evidence of the fact that they simply are different. So even if there was not acquiescence, and I believe there was, there also was really not the appropriate findings for res judicata. Well, let's talk about the transaction test. I mean, with respect to claim preclusion, there should have been. The shareholders' oppression, those facts may have been a little different than the two. Yes. But how about the Wage Act and the Whistleblower Act? Aren't those the same? No. Why? The Wage Act claimed, number one, there was no identity of parties. There was, though, a primity, perhaps, between Dr. Packer and Packer Engineering and the Packer companies, but he was not a party to that action. Once again, the defendants did not move in that action for a dismissal based on a failure in any necessary parties. So he wasn't even there. Secondly, with regard to Whistleblower, Whistleblower really relates to is the legal act of filing a shareholder derivative action, which then is the whistleblowing, if you take actions in retaliation of that. Those are different facts totally that were decided or even addressed in the Cook County action. In terms of the specific claims in this case, and of those, four of the claims actually went to judgment in favor of the plaintiff and against one or more of the defendants. Where are you talking, in DuPage? In DuPage. Uh-huh. Those claims, Judge Wheaton heard a multi-day bench trial. He was able to see and hear the witnesses, see and consider the many exhibits in the testimony. I would submit to the Court that that is a manifest way of the evidence argument, and we have not heard anything to suggest by the defendants in their briefs or oral argument other than to say, I don't agree with the conclusion that Judge Wheaton reached. Judge Wheaton reached those conclusions based upon the statutory elements of the claims and the elements of the torts. Was her ruling, was it subjective, a lot of the dollar amount? There was an element of subjectivity in terms of her basis of credibility. That clearly is a subjective determination by the trial judge. And she found Hockfield. Was not credible. No. I'm sorry for those. Hockfield was. Hacker was not credible. Hacker. They're all doctors. Right. In terms of the dollar amount, is there an element of subjectivity? Yes. There always is some element of subjectivity in any damages. Probably the best way that we see it all the time in cases, are in tort cases for pain and suffering. There is no need there, nor in these claims I would submit to the Court, other than perhaps the wage and the interference with contract claim, to have mathematical certainty. It probably just isn't possible. Once again, the analogy is, you know, how much does your arm hurt after you were in an accident? We can't measure that mathematically. Similarly here, what Judge Wheaton was doing was assessing damages, which were far less than what, actually, I asked in closing argument from the Court for damages, for the actions taken by the defendants as a result of Dr. Packer taking actions against Dr. Hockfield, a shareholder, and the results of Dr. Packer taking actions against Dr. Hockfield for filing what was and is a legally permissible shareholder derivative suit. Those, I think, are decisions that a trial court, just as a jury, can make. If there is any evidence to suggest that those damages would be appropriate based upon the actions, I would submit that those are certain enough. So is there an element of subjectivity? Yes, there is always, unless we have mathematical certainty. But that element of subjectivity is not enough to defeat what Judge Wheaton found. In terms of the counterclaims that plaintiff says they should have been brought, those do have a different standard, the standard of de novo review. But once again, those counterclaims essentially all go back to the same thing. They go back to the shareholder derivative action and the actions taken to file that. Now, they respond by saying, well, there was a conflict. The conflict that was found by the Illinois Appellate Court in the First District is not a conflict that it sounds like. It was a conflict saying you're suing the company in other places, so you shouldn't also be a plaintiff here on other people's behalf. And then there was a substitution of parties in that case. There was never a finding in that case or otherwise that Dr. Hockfield acted in any manner inconsistent or improper. Further, the First District, in its opinion in the shareholder derivative suit, directly also addressed in that suit the whole Newford Million issue that the Court asked about a few moments ago. And it found in quotes on pages 7, 89, and 95 of the record here, the facts related to Newford Million and the use of corporate funds or other assets sufficiently established intentional breaches of fiduciary duty. It appears that the assumption by Dr. Packer's loan obligations and use of corporate employees may not have been presented or approved by the Board. It also was not something that Dr. Caulfield was involved in. The Court asked, well, wasn't Dr. Caulfield there, and couldn't he vote in terms of the assignment, et cetera? Dr. Caulfield was, according to the record, terminated on 4-1 of 2011. In 2012, a year later, the assignment occurred. He was long gone by that point. Dr. Packer ran this company and ran it completely to his whim. What this is really a case about, it's a case about where the defendants got their hands caught in the cookie jar. And rather than saying, okay, I'll do what's right, and the independent board of the Packer Company said to do what's right is put the money back in the cookie jar and resign. He didn't do that. He basically forced the entire independent board, as the record demonstrates, to resign. And he continued. Once Dr. Caulfield filed the shareholder derivative suit, the actions and the litany of actions taken because he was a shareholder and only a shareholder can file a shareholder derivative suit began. And that's how they oppressed Dr. Caulfield throughout this. Ultimately, termination. I'm sorry. No. At any time did Caulfield hold a position of power over Packer? Over Packer? No. No. Caulfield was at one point the chief technical officer and president of Packer Engineering. The ownership of Packer Engineering was held by the Packer Group, and that was Dr. Packer. So Dr. Packer was always above it. Dr. Packer was the chairman of that board. And, in fact, it was Dr. Packer that the independent board sought to have removed, and he wouldn't release himself. Well, the initial loan or money that went into New Vermillion was about $250,000. It was small. Smaller. Smaller. What is the final amount that was alleged? Didn't it get over a million dollars? I don't remember the exact amount. I believe Your Honor is correct, but I don't know the actual amount. And where was Dr. Caulfield during this time? He was employed by the company during this period of time, but did not until later when Dr. Kohler came to him saying, what about these monies, where are they going? Was he aware of what happened? And that's when he asked through an attorney to have a special board committee appointed and have that special board committee look at this particular issue, which it, in fact, did, and concluded that as a result of its investigation, Dr. Packer should refund any of the money back to the company that it spent on his behalf. And he should resign. And was this all physical money taken and put directly there, or what is this about using some Packer employees over at New Vermillion to pay him? It's primarily debt obligations that the company is paying and also having employees practically loaned out or used in that venture. Did that require the okay of the president? It should have required the okay of the president of the board, but Dr. Packer didn't go that route. And because of that, it was basically hidden until such time that Dr. Kohler and Dr. Packer got together and then made this demand on the board to have an independent committee, which they then had. So I believe what we have here is we have a case that proceeded, and it did quite candidly within two forums, but on different claims and on different facts. And because of those operative facts being different based upon the claims and the actions taken by the defendant, which are really non-actions in both cases, to stop it through a 619A3 motion, the judgment of the Page County Circuit Court should be affirmed in all respects. Thank you. I have one brief question. Mr. Borscher brought up the assignment to the creditors, and he indicated that your client had every opportunity to object, and he never did. The assignment to creditors occurred in 2012, a year after he was terminated from the company. As Judge Wheaton found when they presented effectively a financial statement saying, here's the bad financial health of the Packer companies, they had accelerated all the shareholder payments and left Dr. Caulfield off that list. So he didn't have an opportunity to do anything at that point, because when you look at the timeline again, he's gone almost a year by that point. He's not entitled to any sort of notice because he's not on the list? He should have gotten notice, but the notice would have done a whole lot. You know, that is a minority shareholder in any event. Okay. Thank you. Thank you. Mr. Borscher, rebuttal. I want to start off where Caulfield just ended. What he just said is totally false. Not only did Dr. Caulfield get notice of the assignment, he filed a claim with the assignee. That's in the papers. That's in the record. But he wasn't on the initial list. Sure he was. He was assured. All of us assured of him. That's why he filed the claim. He was given notice of the assignment, notice of the sale of the assets, and filed a claim with the assignee in response to the notice. That's in the record. The issue of what counsel said in this case about somebody with their hands in a cookie jar, that's not what this case is about. That's the derivative case. That's a separate action. This is a shareholder oppression, whistleblower claim. And for counsel to say somehow about, Your Honor, you asked about this issue with Vermillion. The issue is, what counsel doesn't say is, the expenses, most of them were employees at Caulfield who were going down there to work there. They were working on a $13 million contract at Packer Engineering with the government for Packer Engineering, not New Vermillion. Packer Engineering received $100,000 or more in funds from the government. Not Dr. Packer. But that's not what this case is about. That's a derivative case. The issue of, he's saying this is Dr. Packer's company, he ran everything. That's not the record. Charles Sartain was the chief financial officer of the company. She testified what her role was. She decided what employees got paid. She made the contract with Caulfield, not Dr. Packer. Even Dr. Caulfield says that. The issue of the company only had a business. The trial court found that as of May of 2014, there were a growing concern. They had shut their door until May of 2012. They had shut their doors in January of 2012. The bank cut off their line of credit. They had no money. They fired all their employees, including Dr. Packer. So they were not a growing concern in May of 2012. Who fired them? Who's left to fire them? Who's left to fire Dr. Packer? In January of 2012, the company has no money to pay employees. They have a meeting and say everybody's fired because we're out of money. The bank shut off their line of credit. They had no money to operate. And yet five months later, the trial court says they were a growing concern. There's no evidence in record to support that. The bank today is on more than $3 million. They couldn't afford to pay. They were out of business. Their doors were shut. The issue of— What happened to the $13 million contract? The government voided it because they went with a different procurement method. That's in the record. The government changed the procurement method for the steel. That wasn't Packer's doing. The government changed their procurement. But they gave initial contracts to Packer for armored plating for the military. The government pulled out, not Dr. Packer. The issue of filing the suit, and what counsel says is this is about whistleblowing. He ignores the fact that in the Cook County case, Dr. Caulfield filed a retaliatory discharge case. It was not just a simple breach of contract case. And the retaliatory discharge claims, all the arguments he's making in this case were made in that case. He argued he retaliated against it. If you look at the allegations, they're basically the same he alleged in this case about why he was retaliatory discharged. And the appellate court eventually threw that claim out. But, counsel, the fact remains that even though you didn't bring that motion for summary judgment until the appellate court first district finished, you were doing things all along, trying to file things, losing efforts maybe, trying to do discovery, trying to do— Why were you doing that? There was no discovery. Well, what was— So, counsel, look at—you wonder why the case of 511 isn't going to trial in 2017? Why there were no 218 orders even entered? You wonder why? Here's why. Because I found the reference in the brief. What counsel said, plaintiff's counsel to the court, this is in February of 14, that we completed our trial in Cook County and did receive a verdict in that case. So I think both parties are going to explore any race judicata or collateral stopper. That's what they said. Well, they explored it. They just didn't do anything about it. What did you do? Sure they did. They filed a claim conclusion motion. They did something about it. They filed that shortly thereafter. And we filed a race judicata motion because both sides decided the Cook County case is going to trial. That's what—this case was put on the back burner without any thought. So that's why there was no trial. That's what they said. No discovery cutoff said. Because everybody knew the Cook County case was going to resolve this case, and it did. Because we resolved this case by going to trial on facts identical to this case. And, therefore, this case should not have gotten past summary judgment. Thank you. The Court thanks both parties for the arguments today. The case will be taken under advisement. A written decision will be issued in due course.